**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IARNACH TECHNOLOGIES LTD., | |
| Plaintiff, | Civil Action No. 2:23-cv-00231 |
| v. | |
| AT&T INC., AT&T CORP., AT&T COMMUNICATIONS LLC, AT&T MOBILITY LLC, AT&T MOBILITY II LLC, and AT&T SERVICES INC. | **JURY TRIAL DEMAND** |
| Defendants. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Iarnach Technologies Ltd. ("Iarnach" or "Plaintiff") hereby submits this Complaint for patent infringement against Defendants AT&T Inc., AT&T Corp., AT&T Communications LLC, AT&T Mobility LLC, AT&T Mobility II LLC, and AT&T Services Inc. (collectively, "AT&T" or "Defendants") and states as follows:

## THE PARTIES

1.      Iarnach Technologies Ltd., ("Iarnach" or "Plaintiff") is a company duly organized and existing under the laws of Ireland with its principal place of business at The Hyde Building, Suite 23, The Park, Carrickmines, Dublin 18, Ireland.

2.      On information and belief, AT&T Inc. is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 208 South Akard Street, Dallas, Texas 75202. On information and belief, AT&T Inc. may be served through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201.

3.      On information and belief, AT&T Corp. is a corporation organized and existing under the laws of the state of New York, with its principal place of business at One AT&T Way, Bedminster, New Jersey 07921. On information and belief, AT&T Corp. may be served through its registered agent for service, CT Corporation System, 28 Liberty Street, New York, New York 10005. On information and belief, AT&T Corp. is a wholly owned subsidiary of AT&T Inc.

4.      On information and belief, AT&T Communications LLC is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 208 South Akard Street, Dallas, Texas 75202. On information and belief, AT&T Communications LLC may be served through its registered agent for service, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, AT&T Communications LLC is a wholly owned subsidiary of AT&T Inc.

1

5.  On information and belief, AT&T Mobility LLC is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia 30319. On information and belief, AT&T Mobility LLC may be served through its registered agent for service, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, AT&T Mobility LLC is a direct or an indirect subsidiary of AT&T Inc.

6.  On information and belief, AT&T Mobility II LLC is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 1025 Lenox Park Boulevard NE, Atlanta, Georgia 30319. On information and belief, AT&T Mobility II LLC may be served through its registered agent for service, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, AT&T Mobility II LLC is a direct or an indirect subsidiary of AT&T Inc.

7.  On information and belief AT&T Services Inc. is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business at 208 South Akard Street, Dallas, Texas 75202. On information and belief, AT&T Services Inc. may be served through its registered agent for service, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, AT&T Services Inc. is owned by AT&T Inc.

8.  AT&T operates one or more fiber-optic networks under brand names including, but not limited to, "AT&T," "AT&T Fiber," and "AT&T Business Fiber."

## NATURE OF THE ACTION

9.  This is a civil action for infringement of U.S. Patent No. 8,712,242 ("the '242 Patent", Ex. A), U.S. Patent No. 8,934,359 ("the '359 Patent", Ex. B), U.S. Patent No. 8,942,378

("the '378 Patent", Ex. C), U.S. Patent No. 9,363,013 ("the '013 Patent", Ex. D), and U.S. Patent No. 9,806,892 ("the '892 Patent", Ex. E) (collectively, the "Asserted Patents"), arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

10.    Iarnach holds all rights, title, and interest in and to the Asserted Patents, including the right to bring this suit and recover all past, present and future damages for infringement of the Asserted Patents. *See* Ex. F. AT&T is not licensed to the Asserted Patents, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the Asserted Patents whatsoever.

## <u>JURISDICTION AND VENUE</u>

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq.*

12.    On information and belief, AT&T's operations in the Eastern District of Texas are substantial and varied.

13.    AT&T advertises that its broadband internet services are available in the United States, including in Texas and within the Eastern District of Texas.





4





https://www.att.com/buy/broadband/offers.html?product_suite=NBB (last visited May 26, 2023).

14.    AT&T advertises that its fiber internet services were made available in over 300,000 new locations in Texas in 2021. https://about.att.com/story/2022/amarillo-broadband-access.html (last visited May 26, 2023).



https://www.att.com/local/fiber (last visited May 26, 2023).

15.    AT&T offers fiber internet services in the Eastern District of Texas, including Plano.



https://www.att.com/local/fiber/texas/plano (last visited April 24, 2023).

16.     AT&T offers fiber internet services in the Eastern District of Texas, including Sherman.

7



https://www.att.com/local/fiber/texas/sherman (last visited April 24, 2023).

17.     AT&T offers fiber internet services in the Eastern District of Texas, including Richardson.



https://www.att.com/local/fiber/texas/richardson (last visited April 24, 2023).

18.    AT&T offers fiber internet services in the Eastern District of Texas, including Beaumont.



https://www.att.com/local/fiber/texas/beaumont (last visited April 24, 2023).

19.    AT&T offers fiber internet services in the Eastern District of Texas, including Lufkin.



https://www.att.com/local/fiber/texas/lufkin (last visited April 24, 2023).

20.    AT&T offers AT&T Business Fiber services in the Eastern District of Texas:



https://www.att.com/smallbusiness/fiber/ (last visited May 17, 2023).

21.    Numerous AT&T retail stores are located within this judicial district, including in Allen, Athens, Beaumont, Canton, Carthage, Denton, Frisco, Gilmer, Henderson, Kilgore, Lindale, Longview, Lufkin, Marshall, Nacogdoches, Sulphur Springs, Texarkana, and Tyler. https://www.att.com/stores (last visited April 24, 2023). AT&T uses these stores to sell services and devices that utilize AT&T's fiber network and that infringe the Asserted Patents (as discussed below). These stores are physically located within the district, are regular and established places of business of AT&T with signage of AT&T, and actively market AT&T's network services.

22.    AT&T also maintains a foundry innovation center within this judicial district at 2900 W Plano Pkwy, Plano, Texas 75075. The "AT&T Foundry innovation centers are fast-paced and collaborative environments where AT&T teams work with developers to deliver the latest apps, products and services to market faster than ever before," and "developers work with AT&T technology experts, access resources they can't get anywhere else, and accelerate their innovations."    https://www.att.com/Common/about_us/pdf/infographic_foundry_overview.pdf (last visited April 24, 2023). On information and belief, this AT&T Foundry is used to design, test,

use, promote, and sell AT&T fiber internet, including the services and devices accused of infringement in this action. The AT&T Foundry is physically located within the district and is a regular and established place of business of AT&T.

23.    AT&T has numerous employees who work in the State of Texas and in this judicial district.    AT&T    represents    that    its    headquarters    are    in    Dallas,    Texas. https://www.headquartersinfo.com/att-headquarters-information/ (last visited April 24, 2023).

24.    AT&T has solicited business in the State of Texas, transacted business within the State of Texas and attempted to derive financial benefit from residents of the State of Texas, including benefits directly related to the instant patent infringement cause of action set forth herein.

25.    AT&T has manufactured, used, sold, and/or offered for sale AT&T fiber networks and network services in the State of Texas and this judicial district.

26.    At the time of filing of this Complaint, AT&T Fiber (AT&T's fiber-optic based internet plans) is available to consumers in Texas, including within this judicial district.

27.    AT&T's fiber-optic networks and networks services, which are available in this judicial district, are accused of infringement in this Complaint.

28.    AT&T derives benefits from its presence in this federal judicial district, including, but not limited to, sales revenue. For example, AT&T receives revenue from its corporate stores in this district, by selling network access, products (*e.g.*, ONUs) and services, and by receiving payment for its network access, products, and services.

29.    AT&T's commission of acts of infringement, and the presence of AT&T retail stores and foundry in the Eastern District of Texas, establishes venue over it under 28 U.S.C. § 1400(b). *See, e.g.*, *Intellectual Ventures II LLC v. FedEx Corp.*, Case No. 16-cv-980-JRG, 2017 WL

5630023, at *6–7 (E.D. Tex. Nov. 22, 2017) (Gilstrap, J.) (venue proper based on defendants' "physical retail and service locations").

30.    In other recent actions, AT&T has either admitted or not contested that this federal judicial district is a proper venue for patent infringement actions against it. *See, e.g.,* Answer, at 3, ¶ 14, *Kaifi, LLC v. AT&T Corp. et al.*, Case No. 2:19-cv-138 (E.D. Tex. Jul. 08, 2019), ECF No. 17; Answer at 2, ¶ 6, *Ramrod Licensing LLC v. AT&T Mobility LLC*, Case No. 2:21-cv-117 (E.D. Tex. Jul. 08, 2021), ECF No. 21; Answer at 2, 3, ¶ 6, *Finesse Wireless LLC v. AT&T Mobility LLC*, Case No. 2:21-cv-063 (E.D. Tex. May 04, 2021), ECF No. 24; Answer at 2, 3, ¶ 6, *Finesse Wireless LLC v. AT&T Mobility LLC*, Case No. 2:21-cv-316 (E.D. Tex. Sep. 03, 2021), ECF No. 14.

31.    Venue as to AT&T is proper in this judicial district under 28 U.S.C. §§1391(b)-(c) and 1400(b) at least because AT&T has committed acts of infringement in this judicial district and has a regular and established place of business in this judicial district. Each Defendant makes, uses, sells, offers to sell, and/or imports products and/or services accused of infringement in this case into and/or within this judicial district and maintains a permanent and/or continuing presence within this judicial district. On information and belief, each Defendant has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this judicial district.

32.    AT&T is subject to personal jurisdiction under the provisions of the Texas Long Arm Statute, TX CIV. PRAC. & REM CODE § 17.041 *et seq.*, by virtue of the fact that, upon information and belief, AT&T has availed itself of the privilege of conducting and soliciting business within this State, including engaging in at least some of the infringing activities in this State, as well as by others acting as AT&T's agents and/or representatives, such that it would be reasonable for this Court to exercise jurisdiction consistent with principles underlying the U.S.

14

Constitution, and the exercise of jurisdiction by this Court would not offend traditional notions of fair play and substantial justice.

33.     On information and belief, AT&T has also established minimum contacts with this judicial district and regularly transacts and does business within this district, including advertising, promoting and selling products and/or services in its stores, over the internet, through intermediaries, representatives and/or agents located within this judicial district, that infringe the asserted patents. On further information and belief, AT&T has purposefully directed activities at citizens of this State including those located within this judicial district. On information and belief, AT&T derives substantial revenue from the goods and services it provides to individuals in the state of Texas and in this judicial district.

34.     On information and belief, AT&T has purposefully and voluntarily placed its products and/or services into the stream of commerce with the expectation that they will be purchased and used by customers located in the State of Texas and the Eastern District of Texas. On information and belief, AT&T's customers in the Eastern District of Texas have purchased and used and continue to purchase and use AT&T's products and/or services.

35.     Defendants are properly joined under 35 U.S.C. § 299(a)(1) because, as set forth in greater detail below, on information and belief, Defendants commonly and/or jointly make, use, sell, offer to sell, and/or import infringing instrumentalities, such that at least one right to relief is asserted against Defendants jointly, severally, and in the alternative with respect to the same transactions, occurrences, or series of transactions or occurrences relating to the making, using, selling, offering to sell, and/or importing into the United States the same accused instrumentalities, as set forth in greater detail herein.

36.     Defendants are properly joined under 35 U.S.C. § 299(a)(2) because, as set forth in greater detail below, on information and belief, Defendants make, use, sell, offer to sell in, and/or import into the United States the same or similar accused instrumentalities, such that questions of fact that are common to all Defendants will arise in this action.

## **BACKGROUND**

37.     On information and belief, AT&T provides more than 100 million U.S. consumers with communications and entertainment experiences across mobile and broadband. https://investors.att.com/investor-profile (last visited April 24, 2023). It also serves millions of business customers—including nearly all of the Fortune 1000—with high-speed, highly secure connectivity and smart solutions. *Id*. "AT&T Communications" generated 2022 revenues of $117.1 billion. *Id*.

38.     AT&T describes its two key areas of business focus as "5G and fiber." https://investors.att.com/investor-profile (last visited April 24, 2023). AT&T offers fiber-optic network services in approximately 24 million locations in over 100 metro areas in the United States. *Id*. "AT&T Fiber is America's fastest growing subscriber base" and has added "more than 1 million AT&T Fiber subscribers for 5 years in a row." *Id*. In 2022, AT&T's Consumer Wireline division brought in $12.7 billion in revenue. *Id*. AT&T's Business Wireline group serves "nearly 2.5 million" customers, and over 750,000 U.S. buildings are equipped with AT&T fiber. *Id*.

39.     AT&T advertises that fiber is an important component of its business. At AT&T's March 11, 2022 Analyst and Investor Conference, AT&T stated that "fiber is foundational" to its business.



https://investors.att.com/~/media/Files/A/ATT-IR-V2/events-and-presentations/11mar22-presentation.pdf ("AT&T March 2022 Investor Presentation") at 19.

40.    On a March 11, 2022 earnings call, AT&T stated that "to us, fiber is foundational to our entire network. We seamlessly plan and operate one large fiber network with multiple purposes or endpoints." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

41.    AT&T states that "fiber remains economical as data consumption increases."

AT&T March 2022 Investor Presentation at 20.

42. AT&T states that it is expanding its fiber network to reach "30M+ consumer locations by 2025" and is adding "3.5-4M" new customer locations annually.



AT&T March 2022 Investor Presentation at 24. "Based upon our current build rate, we expect our fiber inventory to increase by 3.5 million to 4 million locations over each of the next several years." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

43. AT&T states that "we are currently spending in the range of $3 billion to $4 billion per year to target our goal of 30 million-plus locations by 2025." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

44. AT&T stated that it added 1.2 million fiber customers in 2022.



https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2022/4Q22/ATT_4Q22_Earnings.pdf ("AT&T January 2023 Investor Update") at 3.

45.     AT&T added 272,000 new fiber subscribers in the first quarter of 2023. https://about.att.com/story/2023/q1-earnings.html (last visited April 24, 2023).

46.     AT&T stated that it is "accelerating [fiber] penetration at record rates."



AT&T March 2022 Investor Presentation at 35.

19

47.    AT&T stated that its "12-month consumer penetration rates exceeding expectations."



AT&T January 2023 Investor Update at 5.

48.    AT&T states that it is actively reinvesting profits into its fiber network.



AT&T March 2022 Investor Presentation at 49.

49.     AT&T stated that "today, 20% of our wireline footprint is served with fiber. By 2025, our goal is to improve this to more than 75% served by fiber and 5G, which represents the majority of our network service area." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

50.     In the first quarter of 2022, AT&T added 289,000 "fiber-to-the-premises" (FTTP) subscribers. https://www.lightreading.com/opticalip-networks/fiber-gains-offset-legacy-broadband-pains-at-atandt/d/d-id/776970 (last visited April 24, 2023).

51.     AT&T states that fiber provides the company with "superior product and strong competitive position," providing "mid to high teens fiber returns."



AT&T March 2022 Investor Presentation at 36.

52.     AT&T markets "bundles" where a customer purchases both fiber internet and wireless cell phone services from AT&T. AT&T describes this as "wireless cross-sell" and states that its wireless market share is 50% higher in AT&T's fiber footprint. Thus, AT&T is using its fiber internet product offering to drive sales of its other products and services, including its wireless cell phone service.



AT&T March 2022 Investor Presentation at 33. AT&T also states that it focuses on "targeted offers and proactive distribution." *Id*.

53.    AT&T stated on an earnings call that "where fiber goes wireless follows. We've proven we can grow wireless relationships where we have fiber. In fact, our wireless market share is 50% higher in our fiber footprint. And we're not just talking about discounting a bundle. Rather, we create a halo effect by providing premium reliable products." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

54.    AT&T stated that "cross-selling into our fiber base is a key wireless growth tactic." https://seekingalpha.com/article/4495026-t-inc-t-ceo-john-stankey-hosts-2022-and-t-analyst-and-investor-day-transcript (last visited April 24, 2023).

55.    In addition to consumer customers, AT&T also markets and sells fiber-based network services to enterprise/business customers. AT&T states that it has relationships with approximately 90% of Fortune 1000 companies. AT&T March 2022 Investor Presentation at 38.

AT&T is also "expanding fiber footprint to small & midmarket businesses" at an internal rate of return in the "low to mid twenties."



AT&T March 2022 Investor Presentation at 39.

56.    In its "Financial Outlook," AT&T states that its total broadband revenue in 2021 was $9.1 billion, it anticipated a 6% growth in 2022, and mid to high single digit growth in 2023.



AT&T March 2022 Investor Presentation at 54.

57.    AT&T describes receiving "accelerating broadband revenue growth from Fiber."



AT&T March 2022 Investor Presentation at 58.

58.    AT&T began deploying fiber internet to homes and businesses in approximately 2010.    https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html    (last visited April 24, 2023). AT&T's original fiber-based networks implemented Gigabit Passive Optical Networking (GPON) technology. *Id*. In 2020, AT&T began deploying an XGS-PON system. AT&T describes itself as "an early adopter of XGS-PON with the largest deployment in North America." *Id*. AT&T states that "with XGS-PON, we increased our network fiber capacity by 4x in the downstream and 8x in the upstream at roughly the same economics as our prior GPON investment." *Id*.



*Id.* AT&T states that it is a member of the 25GSPON MSA group and expects "to bring 25GS-PON to maturity in the next 6 to 12 months." *Id.*

59.    AT&T's new fiber services are based on XGS-PON.



https://techblog.comsoc.org/2022/06/30/att-to-deploy-fttp-network-based-on-xgs-pon-in-amarillo-tx/ (last visited April 24, 2023); https://techblog.comsoc.org/2020/03/05/att-deploys-xgs-pon-to-power-ftth-nets/ (last visited April 24, 2023); https://www.fiercetelecom.com/tech/multi-gig-pon-101-q-a-at-t (last visited April 24, 2023).

60.    AT&T created the following high-level diagram to illustrate its XGS-PON network:



Figure 4 - XGS-PON Network

AT&T Open XGS-PON NFV 1RU OLT Specification at 9.

## ACCUSED INSTRUMENTALITIES

61.    The Accused Instrumentalities include all components necessary for AT&T to provide fiber-optic networks and network services to its customers, including all hardware and software, optical line terminals (ONTs), and optical network units (ONUs)/optical network terminals (ONTs). This includes both residential and commercial customers, as well as fiber used in AT&T's wireless backhaul.

62.    AT&T's ONUs include (but are not limited to) the BGW320. https://www.att.com/support/article/u-verse-high-speed-internet/KM1010361/ (last visited April 24, 2023). The BGW320 is an XGS-PON ONU. *See* BGW320-500 XGS Broadband Gateway Release 1.0 Install and Operation Guide.

63.    AT&T currently offers at least five fiber residential service plans: 5 GIG speed; 2 GIG speed; Up to 1 GIG speed; 500 Mbps speed; and 300 Mbps speed.



https://www.att.com/internet/fiber/ (last visited May 8, 2023).

64.    AT&T advertises the following "speed tiers" for its fiber:

## AT&T speed tiers

**Wired network**

**AT&T Fiber**
AT&T Fiber is an ultra-fast broadband technology. It's delivered over a fiber optic connection to the premises. Or, it's delivered to units within certain Multi-Dwelling Units (MDU). All speed tiers are symmetrical.

| AT&T Speed Tier | Expected Speeds [1] | |
|---|---|---|
| | Download | Upload |
| Internet 5 | 5 | 5 |
| Internet 10 | 10 | 10 |
| Internet 25 | 25 | 25 |
| Internet 50 | 50 | 50 |
| Internet 100 | 100 | 100 |
| Internet 300 | 300 | 300 |
| Internet 500 | 500 | 500 |
| Internet 1000 | 1000 | 1000 |
| Internet 2000 | 2000 | 2000 |
| Internet 5000 [2] | 5000 | 5000 |

https://www.att.com/support/article/u-verse-high-speed-internet/KM1010095 (last visited May 8, 2023).

65.    AT&T currently offers at least six fiber commercial service plans: 5 GIG speed, 2 GIG speed, Up to 1 GIG speed, 500 Mbps speed, 300 Mbps speed, and 50 Mbps speed.



[https://www.att.com/smallbusiness/fiber/](https://www.att.com/smallbusiness/fiber/) (last visited May 17, 2023).

66.    Additionally, on information and belief, AT&T uses fiber backhaul in its cellular networks. *See* [https://investor.frontier.com/news/news-details/2023/Frontier-and-ATT-Ink-Deal-to-Deploy-ATT-Wireless-Infrastructure-in-Frontier-Central-Offices/default.aspx](https://investor.frontier.com/news/news-details/2023/Frontier-and-ATT-Ink-Deal-to-Deploy-ATT-Wireless-Infrastructure-in-Frontier-Central-Offices/default.aspx) (last visited May 17, 2023). Fiber backhaul is used to support AT&T's wireless networks, including its 4G and 5G networks.



*See*      https://techblog.comsoc.org/2023/02/15/att-to-use-frontiers-fiber-infrastructure-for-4g-5g-backhaul-in-25-states/ (last visited May 17, 2023).

67.     AT&T states that "[w]e operate America's best and most reliable wireless network. It's easy to miss, but wireless also depends on fiber. Remember, your smartphone connection is only as fast as the link from a cell tower or other antenna back to the internet. So by design, our wireless traffic promptly moves out of the air and onto our much faster fiber network. This offload improves overall wireless performance, preserves spectrum for strictly mobile applications and cuts the      transport      cost      per-byte."      https://about.att.com/innovationblog/2022/sambar-fiber-expansion.html (last visited May 17, 2023).

68.     AT&T states that "[f]iber is superior technology for things like uploading large files and increased bandwidth. It delivers an amazing experience, with multi-gig speeds and equally fast up- and downlinks. It's also critical for powering technologies like 5G and edge computing." https://about.att.com/innovationblog/2022/sambar-fiber-expansion.html (last visited May 17, 2023).

## COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,712,242

69.     Iarnach hereby incorporates and re-alleges paragraphs 1 through 68 as if fully set forth herein.

70.     On April 29, 2014, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,712,242 ("the '242 Patent"), titled "Ranging Method and Apparatus in Passive Optical Network."

71.     The '242 Patent was originally assigned to ZTE Corporation. On January 9, 2023, the '242 Patent was assigned to Iarnach Technologies Limited. *See* USPTO Reel/frame 062320/0522.

72.     The '242 Patent is generally directed toward the ranging process in a passive optical network. Because an OLT does not know the position of an ONU on which ranging is to be performed, the OLT will open a quiet window to perform the ranging. '242 Patent at 1:64-2:2. However, a quiet window opened for ranging that lasts too long will disrupt the operation of other ONUs that are in the operation state, thereby lowering their transmission efficiency. *Id*. at 2:2-5. As stated in the '242 Patent, "[t]he present invention shortens the open time of the quiet window used for the ranging and improves the efficiency of the upstream transmission, and the implementation method is simple and convenient." *Id*. at Abstract.

73.     Iarnach holds all rights, title, and interest in and to the '242 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '242 Patent. AT&T is not licensed to the '242 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '242 Patent whatsoever. As such, AT&T's infringement described below has injured, and continues to injure, Iarnach.

74.    On information and belief, AT&T has infringed directly and continues to infringe directly the '242 Patent in its implementation of AT&T's fiber-optic networks and network services, including AT&T Fiber internet services. The infringing activities include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of products and/or services by AT&T for operation on its fiber-optic networks and network services that are capable of performing ranging between OLTs and ONUs.

75.    For example, the Accused Instrumentalities practice and/or are capable of practicing representative claim 1 of the '242 Patent, which is directed to a method of ranging in a passive optical network, such as those provided by AT&T in establishing and operating its fiber-optic networks and network services. The following paragraphs provide details regarding one example of AT&T's infringement, and only as to a single patent claim. Iarnach reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under any applicable scheduling order.

76.    Claim 1 of the '242 Patent states:

1. A method for ranging in a passive optical network, comprising:

   obtaining a Round Trip Delay (RTD) between an Optical Line Terminal (OLT) and an Optical Network Unit (ONU); and

   opening a quiet window used for the ranging for the ONU according to the RTD to perform the ranging on this ONU,

   wherein the step of opening the quiet window used for the ranging for the ONU according to the RTD to perform the ranging on this ONU comprises:

   determining a required period T during performing the ranging on the ONU according to the RTD;

   obtaining an open time of the quiet window according to the determined required period T during performing the ranging on the ONU and a preset adjustment time $\Delta t$;

when the ONU is in a ranging state, sending a ranging request to the ONU, and opening the quiet window used for performing the ranging on the ONU simultaneously, wherein the quiet window includes the open time of the quiet window;

receiving a ranging response within the open time of the quiet window; and obtaining an Equalization Delay (EqD) of the ONU that is in the ranging state and sending the EqD to the ONU that is in the ranging state.

'242 Patent at 7:48-8:7.

77.    The Accused Instrumentalities implement at least Claim 1 of the '242 Patent.

78.    AT&T provides multiple AT&T Fiber internet service plans, as the marketing materials from AT&T make clear. *See* https://www.att.com/internet/fiber/ (last visited May 8, 2023). These service plans include providing access to AT&T's fiber-optic networks and network services.

79.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks include hardware and/or software that is configured to be capable of performing ranging between OLTs and ONUs.

80.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks conform to and implement the technical specifications of the XGS-PON standard (ITU-T G.9807.1), including the portions of the specifications referenced below. *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023).

81.    The Accused Instrumentalities comprise "[a] method for ranging in a passive optical network." AT&T's fiber-optic networks and network services implement the XGS-PON standard, and AT&T has described itself as "an early adopter of XGS-PON with the largest deployment in North America." *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html

(last visited May 8, 2023). In a passive optical network, ranging is a procedure for measuring the round-trip delay between an OLT and an ONU. *See* ITU-T G.9807.1 at §3.2.18 at (**"3.2.18 ranging**: A procedure of measuring the round-trip delay between the optical line terminal (OLT) and any of its subtending optical network units (ONUs) with the objective to determine and assign the appropriate equalization delay, which is necessary to align the ONU's upstream transmissions on a common OLT based upstream frame reference. Ranging is performed during ONU activation and may be performed while the ONU is in service."). Ranging is part of the activation phase of an ONU. *See* ITU-T G.9807.1 at §§C.12.1.2, C.12.1.3, C.12.1.4.1.

82.    The Accused Instrumentalities comprise "obtaining a Round Trip Delay (RTD) between an Optical Line Terminal (OLT) and an Optical Network Unit (ONU)." Part of the ranging procedure is measuring the round-trip delay between the OLT and the ONUs. *See* ITU-T G.9807.1 at §3.2.18. During the ranging phase, an OLT will obtain a round-trip delay measurement between and OLT and an ONU. *See* ITU-T G.9807.1 at §C.12.1.2. The XGS-PON standard defines "round-trip delay" as the time delay measure between the OLT and the ONUs. *See* ITU-T G.9807.1 at §§3.1.38, 3.2.20.

83.    The Accused Instrumentalities comprise "opening a quiet window used for the ranging for the ONU according to the RTD to perform the ranging on this ONU." *See* ITU-T G.9807.1 at §3.1.34. When determining the quiet window, the OLT uses ranging information obtained from the serial number response during previous activations of the ONU, which includes the round-trip delay. *See* ITU-T G.9807.1 at §§C.12.1.5, C.13.1.3.

84.    The Accused Instrumentalities comprise "wherein the step of opening the quiet window for the ranging for the ONU according to the RTD to perform the ranging on this ONU comprises" for the reasons set forth in the paragraphs below.

85.    The Accused Instrumentalities comprise "determining a required period T during performing the ranging on the ONU according to the RTD." Equation C.13-5 of the XGS-PON standard is used to calculate the "size of the quiet window during ranging" using the round-trip delay.

$$W_\Delta^{RNG} = RspTime_{var} + \frac{D_{max}(n_{dn} + n_{up})}{c} + T_{RG} \qquad \text{(C.13-5)}$$

*See* ITU-T G.9807.1 at §C.13.1.3.

86.    The Accused Instrumentalities comprise "obtaining an open time of the quiet window according to the determined required period T during performing the ranging on the ONU and a preset adjustment time Δt." The XGS-PON standard explains that the offset of the quiet window is determined by Equation C.13-4 in part by the "dynamically generated StartTime value of the ranging grant."

$$W_0^{RNG} = RspTime_{min} + \frac{L_{min}(n_{1577} + n_{1270})}{c} + \frac{StartTime}{R_{nom}} \qquad \text{(13-4)}$$

*See* ITU-T G.9807.1 at §C.13.1.3.

87.    The Accused Instrumentalities comprise "when the ONU is in a ranging state, sending a ranging request to the ONU, and opening the quiet window used for performing the ranging on the ONU simultaneously, wherein the quiet window includes the open time of the quiet window." As part of the activation process, the OLT may issue ranging grants to the ONU to measure its round-trip delay. *See* ITU-T G.9807.1 at §C.12.1.5. The ranging grant from the OLT directed to the ONU is accompanied by a quiet window. *See* ITU-T G.9807.1 at §C.12.1.5. When in the Ranging state O4, the ONU will interpret any directed bandwidth allocation from the OLT with the PLOAMu flag set as a ranging grant and will respond with a ranging response. *See* ITU-T

35

G.9807.1 at §C.13.1.3. The sending of the ranging request and the opening of the quiet window occur simultaneously, as illustrated in the figure below:



**Figure C.13.3 – Timing relationships during ranging**

ITU-T G.9807.1 at §C.13.1.3.

88.     The OLT sends a bandwidth allocation to a specific ONU, which is called a ranging grant in the XGS-PON standard. *See* ITU-T G.9807.1 at §C.13.1.3. The ONU interprets a directed bandwidth allocation with the PLOAMu flag set as a ranging grant. *See* ITU-T G.9807.1 at §C.13.1.3. Except for the allocation for the ONU in the ranging state, the remainder of the bandwidth map allocations transmitted within the same downstream PHY frame are empty, meaning the remaining ONUs are denied permission to transmit while the ranging process takes place. *See* ITU-T G.9807.1 at §C.13.1.3. Because the directed bandwidth allocation to the targeted ONU and the lack of bandwidth allocation to the remaining ONUs occur in the same downstream PHY frame, they occur simultaneously. *See* ITU-T G.9807.1 at §C.13.1.3.

89.     The Accused Instrumentalities comprise "receiving a ranging response within the open time of the quiet window." During the ranging process, the ONU will respond to directed

ranging grants from the OLT. *See* ITU-T G.9807.1 at §§C.12.1.2, C.12.1.4.1. As illustrated in the figure below, the ONU responds to the ranging grant of the OLT during the quiet window:



**Figure C.13.3 – Timing relationships during ranging**

ITU-T G.9807.1 at §C.13.1.3.

90.    The Accused Instrumentalities comprise "obtaining an Equalization Delay (EqD) of the ONU that is in the ranging state and sending the EqD to the ONU that is in the ranging state." The OLT calculates the equalization delay for the ONUs and communicates the equalization delay to each ONU while it is in the ranging state.

$$EqD_i = T_{eqd} - RTD_i = T_{eqd} - \left(\Delta_i^{RNG} - StartTime \times Q_0\right) \qquad (C.13\text{-}7)$$

ITU-T G.9807.1 at §C.13.1.4.

91.    The ONU receives the equalization delay from the OLT. *See* ITU-T G.9807.1 at §§C.13.1.4; C.12.1.4.1.

92.    Based on the above and because of its conformance with the applicable XGS-PON standards, AT&T directly infringes at least claim 1 of the '242 patent.

93.     In addition to direct infringement by making, using, and selling the Accused Instrumentalities, AT&T also indirectly infringes the '242 patent claims. AT&T has knowledge of the '242 Patent at least as of the filing and service of the original Complaint (Dkt. 1) in this case and continues to make, use, sell, and/or offer for sale the Accused Instrumentalities. Where acts constituting direct infringement of the '242 patent are not performed by AT&T, such acts constituting direct infringement of the '242 patent are performed by AT&T's customers or end-users who act at the direction and/or control of AT&T, with AT&T's knowledge.

94.     Iarnach is informed and believes, and on that basis alleges, that AT&T indirectly infringes at least claim 1 of the '242 patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '242 patent.

95.     For example, AT&T advertises to its customers that its AT&T Fiber internet services implement the XGS-PON standard. https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023). On information and belief, when an AT&T customer with AT&T Fiber internet connects to the network, the ONU at the customer's premises will automatically implement the accused functionality based upon the hardware and software provided in the Accused Instrumentalities.

96.     AT&T also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '242 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. AT&T knows at least as of the date of the filing and service of the original Complaint (Dkt. 1) in this case that the accused products and/or services include hardware

components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '242 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

97.    The acts of infringement by AT&T have caused damage to Plaintiff, and Plaintiff is entitled to recover from Defendants the damages sustained by Plaintiff as a result of Defendants' wrongful acts in an amount subject to proof at trial. The infringement of the '242 Patent by AT&T has damaged and will continue to damage Plaintiff.

## COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 8,942,378

98.    Iarnach hereby incorporates and re-alleges paragraphs 1 through 97 as if fully set forth herein.

99.    On January 27, 2015, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,942,378 ("the '378 Patent"), titled "Method and Device for Encrypting Multicast Service in Passive Optical Network System."

100.    The '378 Patent was originally assigned to ZTE Corporation. On January 9, 2023, the '378 Patent was assigned to Iarnach Technologies Limited. *See* USPTO Reel/frame 062320/0522.

101.    The '378 Patent is generally directed toward encrypting multicast services in a PON within a bearer channel. This increases security while also reducing the complexity of managing encryption on a per multicast-group level. *See* '378 Patent at 1:58-62. The bearer channel encrypting mechanism "reduces the complexities of the OLT encryption mechanism and the ONU decryption mechanism on the premise of guaranteeing the encryption of the multicast service." *Id.* at 3:9-13. This approach improves on the prior art because "it limits the range affected by disclosing

the key from the whole network to a certain PON port, thus improv[ing] the security of the multicast service content." *Id.* at 3:15-18.

102.    Iarnach holds all rights, title, and interest in and to the '378 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '378 Patent. AT&T is not licensed to the '378 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '378 Patent whatsoever. As such, AT&T's infringement described below has injured, and continues to injure, Iarnach.

103.    On information and belief, AT&T has infringed directly and continues to infringe directly the '378 Patent in its implementation of AT&T's fiber-optic networks and network services, including AT&T Fiber internet services. The infringing activities include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of products and/or services from AT&T for operation on its fiber-optic networks and network services that are capable of performing delivery of encrypted multicast services between OLTs and ONUs.

104.    For example, the Accused Instrumentalities practice and/or are capable of practicing representative claim 1 of the '378 Patent, which is directed to a method for encrypting multicast service in a passive optical network, such as those provided by AT&T in establishing and operating its fiber-optic networks and network services. The following paragraphs provide details regarding one example of AT&T's infringement, and only as to a single patent claim. Iarnach reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under any applicable scheduling order.

105.    Claim 1 of the '378 Patent states:

1.  A method for encrypting multicast service in a passive optical network system, the method comprising:

an optical line terminal (OLT) generating a common key, and using the common key to encrypt multicast service data of all different multicast services in a same bearer channel and then sending encrypted data, wherein the multicast service data of all different multicast services in the same one bearer channel use a same common key to carry out encryption; and

said OLT sending the common key applied in encrypting the multicast service data via a management control channel to an optical network unit (ONU) that is activated successfully and applies to receive said multicast service data.

'378 Patent at 7:61-8:7.

106.    The Accused Instrumentalities implement at least Claim 1 of the '378 Patent.

107.    AT&T provides multiple AT&T Fiber internet services plans, as the marketing materials from AT&T make clear. *See* https://www.att.com/internet/fiber/ (last visited May 8, 2023). These service plans include providing access to AT&T's fiber-optic networks and network services.

108.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks include hardware and/or software that is configured to be capable of performing encryption of multicast service between OLTs and ONUs.

109.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks conform to and implement the technical specifications of the XGS-PON standard (ITU-T G.9807.1), including the portions of the specifications referenced below. *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023).

110.    The Accused Instrumentalities comprise "[a] method for encrypting multicast service in a passive optical network system." AT&T's fiber-optic networks and network services implement the XGS-PON standard, and AT&T has described itself as "an early adopter of XGS-

PON with the largest deployment in North America." *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023). ITU-T maintains the G.9807.1 specification which defines the operation of 10 gigabit symmetric passive optical networks (XGS-PON). Section C.15.5.4 details the operation of downstream multicast encryption in XGS-PON.

<div style="border:1px solid">

**C.15.5.4  Downstream multicast encryption**

The key exchange process is initiated by the OLT. The OLT selects the key index to be changed. The OLT takes this key index out of use, to avoid key mismatch during the process of re-keying. The OLT generates each broadcast key using a random number generator suitable for cryptographic purposes.

Using OMCI, the OLT then writes the key to the broadcast key table attribute (see clause 9.13.11 of [ITU-T G.988]) in the MIB of each ONU that is provisioned to receive multicast traffic. The broadcast encryption key is encrypted with the AES-ECB algorithm using the KEK.

The OMCI is an acknowledgement-based protocol, so the OLT can confirm that the ONU has indeed modified the key attribute in question. Once the OLT has confirmed that all relevant ONUs have the new broadcast key, the OLT can put the key index back into service.

</div>

ITU-T G.9807.1 at § C.15.5.4.

111.    The Accused Instrumentalities comprise "an optical line terminal (OLT) generating a common key, and using the common key to encrypt multicast service data of all different multicast services in a same bearer channel and then sending encrypted data, wherein the multicast service data of all different multicast services in the same one bearer channel use a same common key to carry out encryption." The OLT determines the data encryption configuration to be implemented for each ONU based on that ONU's offered capabilities. ITU-T G.9807.1 at § C.15.5.1. Using the ONU Management and Control Interface (OMCI), the OLT configures the encryption key ring attribute for each non-default XGEM port. This includes specifying the direction of encryption (downstream only or both downstream and upstream) and the encryption key type (unicast or broadcast). *Id.*

112.    The key ring attribute is defined in Section 9.2.3 of ITU-T G.988 as part of the GEM (GPON Encapsulation Method) port network CTP (Connection Termination Point) ME (Managed

Entity). A value of 2 for the encryption key ring attribute indicates that the key is for broadcast or multicast traffic. ITU-T G.988 at § 9.2.3. These keys are generated by the OLT and distributed within the network via OMCI. ITU-T G.9807 at § C.15.5.1. The broadcast (multicast) encryption key is a key distributed by the OLT to encrypt multicast service data. ITU-T G.9807 at § C.15.5.4

113.    XGEM Port-IDs are used to define bearer channels to carry traffic in the PON, including multicast service traffic. ITU-T G.9807.1 at §§ C.6.1.5.1, C.6.1.5.8. The bearer channel is a sequence of XGEM frames assigned to the designated XGEM port identifier for that logical connection. The structure of an XGEM frame is illustrated below:



ITU-T G.9807.1 at § C.91.2. The XGEM port-ID field in the XGEM header specifies the XGEM port to which the frame belongs. The Key index filed indicates which encryption key to be used for decrypting the XGEM payload data. *Id.*

114.    The Accused Instrumentalities comprise "said OLT sending the common key applied in encrypting the multicast service data via a management control channel to an optical network unit (ONU) that is activated successfully and applies to receive said multicast service data." The OLT uses OMCI, which is a management control channel, to send the common key for inclusion in the GEM port network CTP and/or Enhanced Security Control managed entities.

115.    The OLT determines the data encryption configuration to be implemented for each ONU based on that ONU's offered capabilities. ITU-T G.9807.1 at § C.15.5.1. Using the ONU

Management and Control Interface (OMCI), the OLT configures the encryption key ring attribute for each non-default XGEM port. *Id.* As detailed previously, the key ring attribute is defined in Clause 9.2.3 of G.988, and a value of 2 for the encryption key ring attribute indicates that the key is for broadcast or multicast traffic. These keys are generated by the OLT and distributed within the network via OMCI, which is implemented via a management control channel. ITU-T G.988 at § 9.2.3; ITU-T G.9807.1 at § C.15.5.1. The OLT uses OMCI to deploy broadcast keys for multicast encryption to each of the ONUs provisioned to receive multicast traffic. ITU-T G.9807.1 at § C.15.5.4. An ONU must complete the activation cycle before it is allowed to process upstream and downstream data in the PON. *See generally* ITU-T G.9807.1 at § C.12.1.4. The general activation state sequence is as follows: (1) Initial State; (2); Serial Number state; (3) Ranging state; and (5) Operation state. In the Operation state, the ONU has been activated and can process network data as intended. *Id.*

116.    Based on the above and because of its conformance with the applicable XGS-PON standards, AT&T directly infringes at least claim 1 of the '378 Patent.

117.    In addition to direct infringement by making, using, and selling the Accused Instrumentalities, AT&T also indirectly infringes the '378 Patent claims. AT&T has knowledge of the '378 Patent at least as of the filing and service of the original Complaint (Dkt. 1) in this case and continues to make, use, sell, and/or offer for sale the Accused Instrumentalities. Where acts constituting direct infringement of the '378 patent are not performed by AT&T, such acts constituting direct infringement of the '378 patent are performed by AT&T's customers or end-users who act at the direction and/or control of AT&T, with AT&T's knowledge.

118.    Iarnach is informed and believes, and on that basis alleges, that AT&T indirectly infringes at least claim 1 of the '378 patent by active inducement in violation of 35 U.S.C. § 271(b),

by at least manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '378 patent.

119.    For example, AT&T advertises to its customers that its AT&T Fiber internet services implement the XGS-PON standard. https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023). On information and belief, when an AT&T customer with AT&T Fiber internet connects to the network, the ONU at the customer's premises will automatically implement the accused functionality based upon the hardware and software provided in the Accused Instrumentalities.

120.    AT&T also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '378 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. AT&T knows at least as of the date of the filing and service of the original Complaint (Dkt. 1) in this case that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '378 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

121.    The acts of infringement by AT&T have caused damage to Plaintiff, and Plaintiff is entitled to recover from AT&T the damages sustained by Plaintiff as a result of AT&T's wrongful acts in an amount subject to proof at trial. The infringement of the '378 Patent by AT&T has damaged and will continue to damage Iarnach.

## COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 9,363,013

122.    Iarnach hereby incorporates and re-alleges paragraphs 1 through 121 as if fully set forth herein.

123.    On June 7, 2016, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,363,013 ("the '013 Patent"), titled "Optical Network Unit Power Management in Passive Optical Networks."

124.    The '013 Patent was originally assigned to ZTE Corporation. On January 9, 2023, ZTE Corporation assigned the '013 Patent to Iarnach Technologies Limited. *See* USPTO Reel/frame 062320/0522.

125.    The '013 Patent is generally directed toward isolating and mitigating the behavior of a rogue optical network unit (ONU) on an optical distribution network. ONUs in a given optical distribution network may perform upstream transmission on the same wavelength, which can result in interference between ONUs. Access procedure standards can define multiple access protocols by which the optical line terminal (OLT) can differentiate between different ONUs, for example by assigning transmission time slots to the individual ONUs. An ONU that is newly activated or reactivated may, by way of illustration, enter a discovery stage of the activation cycle in which it declares its presence to the OLT through a unique identifier and waits for the OLT to assign a network ID. Afterward, the ONU may enter a ranging stage, in which the ONU performs one or more short upstream transmissions to allow the OLT to measure the roundtrip propagation time and compute the equalization delay used by the ONU to transmit in a specific time slot. In operation, however, an ONU may exhibit behavior that is inconsistent with the standard requirements or parameters, causing interference and disruption of the optical network. The presence of such a rogue ONU can cause service outages for one or more other ONUs and can render the entire passive

optical network inoperable. The '013 Patent discloses novel systems and methods for identifying rogue ONUs and mitigating their impact on the passive optical network.

126.    Iarnach holds all rights, title, and interest in and to the '013 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '013 Patent. AT&T is not licensed to the '013 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '013 Patent whatsoever. As such, AT&T's infringement described below has injured, and continues to injure, Iarnach.

127.    On information and belief, AT&T has infringed directly and continues to infringe directly the '013 Patent in its implementation of AT&T's fiber-optic networks and network services, including AT&T Fiber internet services. The infringing activities include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of products and/or services from AT&T for operation on its fiber-optic networks and network services that are capable of isolating and mitigating the behavior of a rogue optical network unit.

128.    For example, the Accused Instrumentalities practice and/or are capable of practicing representative claim 1 of the '013 Patent, which is directed to a method to facilitate mitigating of rogue behavior of an optical network unit, such as those provided by AT&T in establishing and operating its fiber-optic networks and network services. The following paragraphs provide details regarding one example of AT&T's infringement, and only as to a single patent claim. Iarnach reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under any applicable scheduling order.

129.    Claim 1 of the '013 Patent states:

1. A method, implementable at an optical line terminal (OLT) in a passive optical network (PON) system, to facilitate mitigation of rogue behavior of an optical network unit (ONU), the method comprising:

detecting presence of a rogue ONU on the PON system;

transmitting, based on the detection, a first message addressing only a subset of all ONUs on the PON system; and

wherein the subset includes at least one of a first group of ONUs that have not yet being discovered and a second group of ONUs that are not identifiable, the method further including:

probabilistically splitting in time discovery phases of ONUs in the first group of ONUs.

'013 Patent at 10:56-11:2.

130.    The Accused Instrumentalities implement at least Claim 1 of the '013 Patent.

131.    AT&T provides multiple AT&T Fiber internet services plans, as the marketing materials from AT&T make clear. *See* https://www.att.com/internet/fiber/ (last visited May 8, 2023). These service plans include providing access to AT&T's fiber-optic networks and network services.

132.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks, including OLTs in its PON system, include hardware and/or software that is configured to be capable of facilitating mitigation of rogue behavior of an optical network unit.

133.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks conform to and implements technical specifications of the NG-PON2 standard (including for example ITU-TG.989.3 and ITU-TG.9804.2) or their equivalents, including the portions of the specifications referenced below. *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023).

134.    The Accused Instrumentalities comprise "[a] method, implementable at an optical line terminal (OLT) in a passive optical network (PON) system, to facilitate mitigation of rogue behavior of an optical network unit (ONU)." AT&T's fiber optics networks include optical line

terminals that are configured to be capable of facilitating mitigation of rogue behavior of an optical network unit in the passive optical network.

135.    The Accused Instrumentalities comprise "detecting presence of a rogue ONU on the PON system." AT&T's fiber optics networks include optical line terminals that are configured to be capable of detecting the presence of a rogue ONU on the PON system. For example, AT&T's fiber optics networks include optical line terminals that are configured to be capable of detecting an ONU that transmits optical power up the optical distribution network in violation of the standard parameters, including in violation of transmission time slots assigned by the optical line terminal.

136.    The Accused Instrumentalities comprise "transmitting, based on the detection, a first message addressing only a subset of all ONUs on the PON system." AT&T's fiber optics networks include optical line terminals that are configured to be capable of transmitting, based on the detection, a first message addressing only a subset of all ONUs on the PON system. For example, the OLT may send the downstream physical layer operation administration and maintenance message (PLOAM) "Disable_Serial_Number" with parameters set to disable only a subset of ONUs on the passive optical network. This subset may include the subset of ONUs that are in the discovery state when a rogue ONU has been detected.



137.    The Accused Instrumentalities comprise "wherein the subset includes at least one of a first group of ONUs that have not yet being discovered and a second group of ONUs that are not identifiable." For example, the subset may include the subset of ONUs that are in the discovery state when a rogue ONU has been detected and that have not yet entered the ranging state or are otherwise in the normal operation state. For example, ONUs in the discovery stages O2-3 have not yet been discovered by the OLT and properly identified or assigned a unique identifier.



138.    The Accused Instrumentalities comprise "probabilistically splitting in time discovery phases of ONUs in the first group of ONUs." AT&T's fiber optics networks include optical line terminals that are configured to be capable of probabilistically splitting in time discovery phases of ONUs in the first group of ONUs. For example, AT&T's fiber optics networks include optical line terminals that are configured to be capable of implementing a set-splitting collision resolution protocol, in which an ONU maintains an instance of a virtual stack. Under this protocol, for example, an ONU that wishes to transmit using a contention-based allocation enters the stack on top and transmits a burst. The ONU would then monitor the downstream PLOAM channel for indication of a collision, in which case the ONU executes a random split, with a given probability of remaining on top of the stack and a given probability of dropping a level.

51

### K.4    ONU support of the Set-splitting collision resolution protocol

To implement the set-splitting collision resolution protocol, an ONU maintains an instance of virtual stack (i.e., a single integer $L$ that tracks ONU's own level in the stack). The ONU behaviour is expected to follow these rules:

–    An ONU that first wishes to transmit a burst using a contention-based allocation enters the stack on the top (setting $L = 1$).

–    Only ONUs that are presently on the top of the stack are allowed to transmit (if their $L = 1$).

–    Once an ONU uses a contention-based allocation to transmit a burst, it monitors the downstream PLOAM channel for the allocation interval feedback.

–    If an ONU which transmits a burst participates in a collision, it executes a random SPLIT: with probability of 0.5 remains on top of the stack, and with probability 0.5 pushes itself one level down.

–    Under different conditions, an ONU may either STAY on the current level of the stack, keeping its value of L intact, execute a PUSH, setting $L = L + 1$, or execute a POP, setting $L = L - 1$.

Source:
1.    ITU-T G.989.3 05/2021, pages 233 and 234

139.    Based on the above and because of its conformance with the applicable XGS-PON standards, AT&T directly infringes at least claim 1 of the '013 Patent.

140.    In addition to direct infringement by making, using, and selling the Accused Instrumentalities, AT&T also indirectly infringes the '013 Patent claims. AT&T has knowledge of the '013 Patent at least as of the filing and service of the original Complaint (Dkt. 1) in this case and continues to make, use, sell, and/or offer for sale the Accused Instrumentalities. Where acts constituting direct infringement of the '013 patent are not performed by AT&T, such acts constituting direct infringement of the '013 patent are performed by AT&T's customers or end-users who act at the direction and/or control of AT&T, with AT&T's knowledge.

141.    Iarnach is informed and believes, and on that basis alleges, that AT&T indirectly infringes at least claim 1 of the '013 patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, supplying, distributing, selling, and/or offering for sale the Accused

Instrumentalities to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '013 patent.

142.    For example, AT&T advertises to its customers that its Fiber internet services comply with relevant passive optical network standards. On information and belief, when an AT&T customer with AT&T Fiber internet connects to the network, the ONU at the customer premises will automatically implement the accused functionality based upon the hardware and software provided in the Accused Instrumentalities.

143.    AT&T also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '013 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. AT&T knows at least as of the date of the filing and service of the original Complaint (Dkt. 1) in this case that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '013 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

144.    The acts of infringement by AT&T have caused damage to Plaintiff, and Plaintiff is entitled to recover from AT&T the damages sustained by Plaintiff as a result of AT&T's wrongful acts in an amount subject to proof at trial. The infringement of the '013 Patent by AT&T has damaged and will continue to damage Iarnach.

## COUNT 4: INFRINGEMENT OF U.S. PATENT NO. 9,806,892

145.    Iarnach hereby incorporates and re-alleges paragraphs 1 through 144 as if fully set forth herein.

146.    On October 31, 2017, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 9,806,892 ("the '892 Patent"), titled "Optical Network Unit Power Management in Passive Optical Networks."

147.    The '892 Patent was originally assigned to ZTE Corporation and ZTE (USA) Inc. On January 9, 2023, ZTE Corporation assigned its interest in the '892 Patent to Iarnach Technologies Limited. *See* USPTO Reel/frame 062320/0522. On January 16, 2023, ZTE (USA) Inc. assigned its interest in the '892 Patent to Iarnach Technologies Limited. *See* USPTO Reel/frame 062391/0263.

148.    The '892 Patent is generally directed toward a power management scheme for a passive optical network in which at least two low power states are used. In a first state, the transmitter of the ONU is turned off and the receiver of the ONU is turned on. In a second state, both the transmitter and receiver of the ONU are turned off. Further, the ONU is able to transition directly between the first and second states based on a power management rule. *See* '892 Patent at Abstract.

149.    Iarnach holds all rights, title, and interest in and to the '892 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '892 Patent. AT&T is not licensed to the '892 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '892 Patent whatsoever. As such, AT&T's infringement described below has injured, and continues to injure, Iarnach.

150.    On information and belief, AT&T has infringed directly and continues to infringe directly the '892 Patent in its implementation of AT&T's fiber-optic networks and network services, including AT&T Fiber internet services . The infringing activities include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of products and/or services

from AT&T for operation on its fiber-optic networks and network services that are capable of power management of ONUs within AT&T's fiber internet network.

151.    For example, the Accused Instrumentalities practice and/or are capable of practicing representative claim 1 of the '892 Patent, which is directed to a method of optical communication in a passive optical network for implementing power management of ONUs, such as those provided by AT&T in establishing and operating its fiber-optic networks and network services. The following paragraphs provide details regarding one example of AT&T's infringement, and only as to a single patent claim. Iarnach reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under any applicable scheduling order.

152.    Claim 1 of the '892 Patent states:

1. A method of optical communication in a passive optical network, comprising:
>    operating an optical network unit (ONU) in a first state in which a transmitter of the ONU is turned off and a receiver of the ONU is turned on;
>    operating the ONU in a second state in which both the transmitter and the receiver are turned off;
>    transitioning the ONU directly from the first state to the second state and transitioning the ONU directly from the second state to the first state, based on a power management rule;
>    ensuring the ONU is fully powered up, synchronized, and capable of responding to both upstream and downstream traffic and control before exiting the first state or the second state; and
>    receiving, by the receiver, a power management message from an optical line terminal (OLT); and
>    changing the power management rule based on the received power management message.

'892 Patent at 15:2-21.

153.    The Accused Instrumentalities implement at least Claim 1 of the '892 Patent.

55

154.    AT&T provides multiple AT&T Fiber internet service plans, as the marketing materials from AT&T make clear. *See* https://www.att.com/internet/fiber/ (last visited May 8, 2023). These service plans include providing access to AT&T's fiber-optic networks and network services.

155.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks include hardware and/or software that is configured to be capable of performing optical communication in a passive optical network between OLTs and ONUs for performing power management of the ONUs.

156.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks conform to and implement the technical specifications of the XGS-PON standard (ITU-T  G.9807.1),  including  the  portions  of  the  specifications  referenced  below.  *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023).

157.    The Accused Instrumentalities comprise "[a] method of optical communication in a passive optical network." AT&T's fiber internet services implement the XGS-PON standard, and AT&T has described itself as "an early adopter of XGS-PON with the largest deployment in North America." *See*  https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html  (last visited May 8, 2023).

158.    The Accused Instrumentalities comprise "operating an optical network unit (ONU) in a first state in which a transmitter of the ONU is turned off and a receiver of the ONU is turned on." Section C.16 of G.9807.1 details XGS-PON power management. In Supplement 45 (09/2022) to its G series recommendations, the ITU defines the power saving modes mentioned above in G.9807.1. *See* ITU-T G Suppl. 45 at § 7. When in Doze mode, the ONU powers off the transmitter

while the receiver remains on. *Id.* at § 7.1. The Doze mode is also a component of the Watchful Sleep mode. *Id.* The combination of Doze and Cyclic Sleep are illustrated in the following taxonomy:



**Figure 7-1 – Taxonomy of power-saving techniques**

*Id.* The time during which the Doze state is active within Watchful sleep comprises a first state in which the transmitter of the ONU is turned off and a receiver of the ONU is turned on.

159.    The Accused Instrumentalities comprise "operating the ONU in a second state in which both the transmitter and the receiver are turned off." When in Cyclic Sleep mode, the ONU powers off both the transmitter and the receiver. ITU-T G Suppl. 45 at § 7.1 The Cyclic Sleep mode is also a component of the Watchful Sleep mode, as illustrated above. The time during which the Cyclic sleep state is active within Watchful sleep comprises a first state in which both the transmitter and the receiver are turned off.

160.    The Accused Instrumentalities comprise "transitioning the ONU directly from the first state to the second state and transitioning the ONU directly from the second state to the first

state, based on a power management rule." The OLT provides power management rules to the ONU in the form of power management parameters, such as those listed in Table C.16.1 of G.9807.1. Such parameters include, for example, Ilowpower, Irxoff, Iaware, and Ihold. *See* ITU-T G.9807.1 at § C.16.1.2. These parameters are provided to the ONU by the OLT using the OMCI ME object for dynamic power management control. *See* ITU-T G.988 (11/2022) at § 9.1.14 (defining the Managed Entity for ONU dynamic power management control). Most relevant to the discussion below are the Maximum sleep interval and the Maximum receiver-off interval attributes.

161.    The Ilowpower parameter defines the maximum time an ONU can spend in the LowPower state. ITU-T G.9807.1 at § C.16.1.2. The Ilowpower value is provided to the ONU by the OLT, and it is used by the ONU to establish a Tlowpower parameter controlling a local timer for waking up the ONU to return to an Aware state. *See id.* The Irxoff parameter defines the maximum time the OLT needs from the time it decides to wake up an ONU in a lower power mode until the ONU is fully operational. *Id.* Further, the "ONU timer Trxoff and the OLT timer Talerted are initialized based on Irxoff." *Id.*

162.    The Trxoff timer, which is based off of a power management rule, is used by the ONU to ensure that the time between "Watches" (*i.e.*, turning on the Rx to check for wake-up indications) in the LowPower state does not exceed the time dictated by Irxoff. Thus, transitions from the second state to the first state are based on the power management rule that includes the Irxoff parameter provisioned by the OLT. When the ONU is in a "Watching" state of the LowerPower state (*i.e.*, checking for wake-up indications), it must determine whether to transition to the Aware state or to the "Asleep" state of the LowerPower state. Assuming no other wake-up indications are present (*e.g.*, Forced wake up indication bits from the OLT or local wake up indication information), the ONU must determine whether it has sufficient time for another sleep

cycle before the Tlowpower timer (which is based on the Ilowpower parameter) expires. If enough time exists, then it transitions from the "Watch" state to the "Asleep" state (*i.e.*, first power state to second power state) based on the power management rule that includes the Irxoff and Ilowpower parameters.

163.    The Accused Instrumentalities comprise "ensuring the ONU is fully powered up, synchronized, and capable of responding to both upstream and downstream traffic and control before exiting the first state or the second state." The "Watch" and "Sleep" states detailed above as the first and second states, respectively, are both part of the LowPower state detailed in the G.9807.1 specification. Once the Tlowpower timer expires, the LowPower state transitions to the Aware state.



ITU-T G.9807.1 at Figure C.16.1. As explained regarding the LowPower state, "[b]efore exiting this state, the ONU ensures that it is fully powered up and capable of responding to both upstream and downstream traffic and control." ITU-T G.9807.1 at Table C.16.2 (describing the LowPower state). In order to respond to upstream and downstream traffic and control, the ONU is necessarily synchronized.

164.    The Accused Instrumentalities comprise "receiving, by the receiver, a power management message from an optical line terminal (OLT)." For instance, OMCI messages are used to manage the ONU dynamic power management control ME as detailed above. *See also* ITU-T G.9807.1 at § C.16. In addition to OMCI, the OLT also uses PLOAM messages to coordinate the operation of the power-based state machines maintained at both the OLT and ONU. ITU-T G.9807.1 at § C.16.1.1. Additionally, the transmission of a Forced wake-up indication event by the OLT to the ONU constitutes a power management message. *See* ITU-T G.9807.1 at Table C.16.3. The architecture of distributing OMCI messages in an PON using the OMCC is illustrated below.



The OMCI fits into the overall model for an access network system as illustrated in Figure 6.1-1. The dotted line shows a path for OMCI signals between an OLT and ONU.

**Figure 6.1-1 – Reference model, OMCI**

ITU-T G.988 at Figure 6.1-1; *see also id.* at § 9 (detailing how ME attributes are accessed by the OLT). Any OMCI message from the OLT updating a parameter for the ONU dynamic power management control ME (Section 9.1.14 of ITU-T G.988) constitutes a power management message from an OLT. This includes, at least, OMCI messages updating the Power reduction management mode, Maximum sleep interval, Maximum receiver-off interval, Minimum aware interval, Minimum active held interval, and Maximum sleep interval extension parameters. *See* ITU-T G.988 at § 9.1.14.

165.    The Accused Instrumentalities comprise "changing the power management rule based on the received power management message." Each of the power management rules detailed

above provide the basis for a change in the power management rule implemented at the ONU. For instance, the Sleep_Allow event determines whether an ONU is permitted to exercise a power management mode. Further, the FWI flag "requires immediate ONU wake-up and its transition to the ActiveHeld state."

| Table C.16.3 – XGS-PON ONU state machine inputs | | |
|---|---|---|
| **Input categories** | **Input** | **Semantics** |
| PLOAM events | Sleep_Allow(ON) | The OLT grants permission to the ONU to exercise watchful sleep management mode. |
| | Sleep_Allow(OFF) | The OLT withholds consent to exercise a power management mode. |
| Bit-indication event | Forced wake-up indication (FWI) | Transmitting FWI as a flag of an allocation structure, the OLT requires immediate ONU wake-up and its transition to the ActiveHeld state. |

ITU-T G.9807.1 at § 223. The PLOAM events, as a whole, enable and disable the timers that are used to control the ONU's power modes (*e.g.*, Tlowpower, Taware, Trxoff). Thus, these power management messages effect a change in the power management rule at the ONU. Additionally, the OMCI messages that alter the Power reduction management mode, Maximum sleep interval, Maximum receiver-off interval, Maximum active held interval, and Maximum sleep interval extension affect a power management rule at the ONU. Thus, any OMCI message changing these parameter values effects a change in the power management rule implemented at the ONU.

166.    Based on the above and because of its conformance with the applicable XGS-PON standards, AT&T directly infringes at least claim 1 of the '892 Patent.

167.    In addition to direct infringement by making, using, and selling the Accused Instrumentalities, AT&T also indirectly infringes the '892 Patent claims. AT&T has knowledge of the '892 Patent at least as of the filing and service of the original Complaint (Dkt. 1) in this case and continues to make, use, sell, and/or offer for sale the Accused Instrumentalities. Where acts constituting direct infringement of the '892 patent are not performed by AT&T, such acts

constituting direct infringement of the '892 patent are performed by AT&T's customers or end-users who act at the direction and/or control of AT&T, with AT&T's knowledge.

168.    Iarnach is informed and believes, and on that basis alleges, that AT&T indirectly infringes at least claim 1 of the '892 patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '892 patent.

169.    For example, AT&T advertises to its customers that its AT&T Fiber internet services implement the XGS-PON standard. https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023). On information and belief, when an AT&T customer with AT&T Fiber internet connects to the network, the ONU at the customer premises will automatically implement the accused functionality based upon the hardware and software provided in the Accused Instrumentalities.

170.    AT&T also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '892 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. AT&T knows at least as of the date of the filing and service of the original Complaint (Dkt. 1) in this case that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '892 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

171.    The acts of infringement by AT&T have caused damage to Plaintiff, and Plaintiff is entitled to recover from AT&T the damages sustained by Plaintiff as a result of AT&T's wrongful acts in an amount subject to proof at trial. The infringement of the '892 Patent by AT&T has damaged and will continue to damage Iarnach.

### COUNT 5: INFRINGEMENT OF U.S. PATENT NO. 8,934,359

172.    Iarnach hereby incorporates and re-alleges paragraphs 1 through 171 as if fully set forth herein.

173.    On January 13, 2015, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 8,934,359 ("the '359 Patent"), titled "Method and Passive Optical Network System for Managing Uplink Burst Parameters."

174.    The '359 Patent was originally assigned to ZTE Corporation. On January 9, 2023, ZTE Corporation assigned its interest in the '359 Patent to Iarnach Technologies Limited. *See* USPTO Reel/frame 062320/0522.

175.    The '359 Patent is generally directed toward a method for managing upstream burst overhead parameters in a passive optical network. This allows the OLT and ONU to "improve the bandwidth utilization rate and decrease the complexity of indicating the upstream burst overhead parameters in [a] PON system, so that the ONU and OLT are enabled to flexibly and simply select the upstream burst overhead parameters." '359 Patent at Abstract.

176.    Iarnach holds all rights, title, and interest in and to the '359 Patent, including the right to bring this suit and recover all past, present and future damages for infringement of the '359 Patent. AT&T is not licensed to the '359 Patent, either expressly or implicitly, nor does it enjoy or benefit from any other rights in or to the '359 Patent whatsoever. As such, AT&T's infringement described below has injured, and continues to injure, Iarnach.

177.    On information and belief, AT&T has infringed directly and continues to infringe directly the '359 Patent in its implementation of AT&T's fiber-optic networks and network services, including AT&T Fiber internet services. The infringing activities include, but are not limited to, the manufacture, use, sale, importation, and/or offer for sale of products and/or services from AT&T for operation on its fiber-optic networks and network services that are capable of power management of ONUs within AT&T's fiber internet network.

178.    For example, the Accused Instrumentalities practice and/or are capable of practicing representative claim 1 of the '359 Patent, which is directed to a method for managing upstream burst overhead parameters in a passive optical network, such as those provided by AT&T in establishing and operating its fiber-optic networks and network services. The following paragraphs provide details regarding one example of AT&T's infringement, and only as to a single patent claim. Iarnach reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under any applicable scheduling order.

179.    Claim 1 of the '359 Patent states:

1. A method for managing upstream burst overhead parameters, comprising:

   an optical line terminal or an optical network unit detecting transmission quality of a downlink between the optical line terminal and the optical network unit;

   the optical line terminal or the optical network unit determining the upstream burst overhead parameters suitable for the optical network unit according to the transmission quality; and

   the optical network unit starting to use the upstream burst overhead parameters suitable for the optical network unit after switching time determined by the optical network unit itself or indicated by the optical line terminal;

wherein, before the step of the optical line terminal or the optical network unit detecting the transmission quality of the downlink between the optical line terminal and the optical network unit, the method further comprises:

the optical line terminal determining and identifying N kinds of upstream burst overhead parameter sets according to different levels of link quality, wherein N is an integer and is larger than zero; and

the optical line terminal sending a parameter value or an identification of one default upstream burst overhead parameter set to the optical network unit; and the optical network unit receiving the parameter value or the identification of the upstream burst overhead parameter set in a waiting state and using the upstream burst overhead parameter set; or,

the optical line terminal sending parameter values or identifications of more than one upstream burst overhead parameter set to the optical network unit; and the optical network unit receiving the parameter values or the identifications of the upstream burst overhead parameter sets in a waiting state and using one of the received upstream burst overhead parameter sets.

'359 Patent at 21:46-22:15.

180.    The Accused Instrumentalities implement at least Claim 1 of the '359 Patent.

181.    AT&T provides multiple AT&T Fiber internet service plans, as the marketing materials from AT&T make clear. *See* https://www.att.com/internet/fiber/ (last visited May 8, 2023). These service plans include providing access to AT&T's fiber-optic networks and network services.

182.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks include hardware and/or software that is configured to be capable of performing optical communication in a passive optical network between OLTs and ONUs for performing power management of the ONUs.

183.    On information and belief, the products implemented by AT&T and used in its fiber-optic networks conform to and implement the technical specifications of the XGS-PON standard (ITU-T G.9807.1), including the portions of the specifications referenced below. *See* https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023).

184.    The Accused Instrumentalities comprise "[a] method for managing upstream burst overhead parameters." AT&T's fiber internet services implement the XGS-PON standard, and AT&T has described itself as "an early adopter of XGS-PON with the largest deployment in North America." *See*  https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html  (last visited May 8, 2023). Appendix B.III of G.9807 details the allocation of the physical layer overhead time. The burst profile parameters include the preamble pattern, preamble length, delimiter pattern, delimiter length, and whether FEC parity should be sent. ITU G.9807.1 at 99.

185.    The Accused Instrumentalities comprise "an optical line terminal or an optical network unit detecting transmission quality of a downlink between the optical line terminal and the optical network unit." OTLs and ONUs maintain a variety of performance monitoring indicators that can be used to determine the downlink quality between the OTL and the ONU. ITU G.9807.1 at 192. As detailed in Table C.14.1, a multitude of performance monitoring parameters about the physical layer and the XGEM layer are collected by the OLTs and ONUs. ITU G.9807.1 at 193. Such parameters include, for example, the Corrected FEC bytes, Corrected FEC codewords, Uncorrectable FEC codewords, and Total FEC codewords. *Id.* The parameters collected by the ONU are available to the OLT via OMCI. ITU G.9807.1 at 192. On information and belief, the OLT uses such performance parameters to determine the transmission quality of a downlink between the optical line terminal and the optical network unit.

186.    The Accused Instrumentalities comprise "the optical line terminal or the optical network unit determining the upstream burst overhead parameters suitable for the optical network unit according to the transmission quality." The OLT determines the burst profile parameters that an ONU should use, in part, based on the transmission quality of the network link.

> The concept of a burst profile captures all the aspects of burst overhead control. A burst profile specifies the preamble pattern and length, the delimiter pattern and length, and whether FEC parity should be sent. The OLT establishes one or more burst profiles, and then requests a particular burst profile for each burst transmission.
>
> The OLT has considerable latitude in setting up the profiles, because the OLT's burst receiver is sensitive to the profile parameters. Therefore, the OLT should use profiles that ensure adequate response in its burst mode receiver. However, some basic requirements from the ONU side must be met. Namely, the preamble and delimiter patterns should be balanced and they should have a reasonable transition density. If not, the ONU transmitter driver circuitry may be adversely affected. Also note that the preamble and delimiter patterns could differ in each profile, and this difference could be used by the OLT receiver as an in-band indication of the format of each burst (e.g., FEC active or not).

ITU G.9807.1 at 99.

187.    The Accused Instrumentalities comprise "the optical network unit starting to use the upstream burst overhead parameters suitable for the optical network unit after switching time determined by the optical network unit itself or indicated by the optical line terminal." The ONU will only use a particular set of burst profile parameters when directed by the OLT. ITU G.9807.1 at 159. The OLT is responsible for ensuring that the burst parameter set has been successfully received by the ONU before specifying the use of the parameter set in a BWmap. ITU G.9807.1 at 249.

188.    "[B]efore the step of the optical line terminal or the optical network unit detecting the transmission quality of the downlink between the optical line terminal and the optical network unit," the Accused Instrumentalities comprise "the optical line terminal determining and identifying N kinds of upstream burst overhead parameter sets according to different levels of link quality, wherein N is an integer and is larger than zero." The ONU must obtain a valid set of burst profile parameters before it can begin transmissions, including providing performance indicators to the

OLT. These parameters are conveyed using the Burst_Profile PLOAM message. ITU G.9807.1 at 156. Using Burst_Profile PLOAM messages, the OLT can broadcast burst profiles to all ONUs. Additionally, the OLT can unicast specific burst profiles to individual ONUs, based in part, on the quality of the link between the OLT and specific ONU. Each ONU can maintain up to four different burst profiles. The burst profile index is a two-bit value provided as part of the Burst_Profile message.

| | | appropriate. |
|---|---|---|
| 5 | Burst profile control | An octet of the form VVVV 0FPP, where: |
| | | VVVV – Four-bit profile version. If the content of the profile changes, the OLT should ensure that the version also changes, so that the ONU can detect updates solely on the basis of the version field. |
| | | F – Applicability of the message to specific upstream line rates: |
| | | F = 0:  The profile applies to ONUs transmitting at 2.48832 Gbit/s upstream line rate; |
| | | F = 1:  The profile applies to ONUs transmitting at 9.95328 Gbit/s upstream line rate. |
| | | PP – Two-bit burst profile index. |

ITU G.9807.1 at 160. The Burst_Profile PLOAM message includes the following fields: ONU-ID, Message type ID, SeqNo, Burst Profile control, Upstream FEC indication, Delimiter length, Delimiter, Preamble length, Preamble repeat count, Preamble pattern, PON-TAG, Padding, and MIC. ITU G.9807.1 at 160-61.

189.    The Accused Instrumentalities comprise "the optical line terminal sending a parameter value or an identification of one default upstream burst overhead parameter set to the optical network unit; and the optical network unit receiving the parameter value or the identification of the upstream burst overhead parameter set in a waiting state and using the upstream burst overhead parameter set." Each Burst_Profile message includes an identification of the burst profile (e.g., the 2-bit index). Additionally, each Burst_Profile message includes a set of parameter values corresponding to the burst profile (e.g., delimiter, preamble, FEC indication). During the activation cycle, the ONU learns burst profiles. ITU G.9807.1 at 171-72. Thus, prior to providing downlink

quality indicators to the OLT, the ONU will necessarily learn burst profiles, which include an identification of a burst profile as well as burst profile parameters. The OLT periodically broadcasts a commonly known burst profile, which is a default profile.

> **C.12.1.5   OLT support of the XGS-PON ONU activation**
>
> To allow ONUs to join or resume operations on the PON, the OLT regularly issues serial number grants.
>
> A serial number grant is an allocation structure that is addressed to a broadcast Alloc-ID, carries a commonly known broadcast burst profile, and has the PLOAMu flag set. The serial number grants should have the DBRu flag reset, carry the GrantSize of 0 and be accompanied by an appropriate quiet window.

G.9807.1 at 180.

190.    The Accused Instrumentalities comprise "the optical line terminal sending parameter values or identifications of more than one upstream burst overhead parameter set to the optical network unit; and the optical network unit receiving the parameter values or the identifications of the upstream burst overhead parameter sets in a waiting state and using one of the received upstream burst overhead parameter sets." As detailed above, the OLT provides up to four different burst profile sets to each ONU.

> receiver to adjust to the level of the optical signal and to delineate burst. The length and pattern of preamble and delimiter constitute the profile of the burst. The set of allowed burst profiles is specified by the OLT in advance using a series of Burst_Profile PLOAM messages with distinct burst profile indices. The specific profile to be used with the particular PHY burst is selected by the OLT by specifying a particular burst profile index in the BurstProfile field in the corresponding BWmap

ITU G.9807.1 at 147.

191.    Based on the above and because of its conformance with the applicable XGS-PON standards, AT&T directly infringes at least claim 1 of the '359 Patent.

192.    In addition to direct infringement by making, using, and selling the Accused Instrumentalities, AT&T also indirectly infringes the '359 Patent claims. AT&T has knowledge of the '359 Patent at least as of the filing and service of the original Complaint (Dkt. 1) in this case and continues to make, use, sell, and/or offer for sale the Accused Instrumentalities. Where acts

constituting direct infringement of the '359 patent are not performed by AT&T, such acts constituting direct infringement of the '359 patent are performed by AT&T's customers or end-users who act at the direction and/or control of AT&T, with AT&T's knowledge.

193.    Iarnach is informed and believes, and on that basis alleges, that AT&T indirectly infringes at least claim 1 of the '359 patent by active inducement in violation of 35 U.S.C. § 271(b), by at least manufacturing, supplying, distributing, selling, and/or offering for sale the Accused Instrumentalities to its customers with the knowledge and intent that use of those products would constitute direct infringement of the '359 patent.

194.    For example, AT&T advertises to its customers that its AT&T Fiber internet services implement the XGS-PON standard. https://about.att.com/innovationblog/2022/20-gbps-symmetric-speeds.html (last visited May 8, 2023). On information and belief, when an AT&T customer with AT&T Fiber internet connects to the network, the ONU at the customer premises will automatically implement the accused functionality based upon the hardware and software provided in the Accused Instrumentalities.

195.    AT&T also indirectly infringes by contributing to the infringement of, and continuing to contribute to the infringement of, one or more claims of the '359 Patent under 35 U.S.C. § 271(c) and/or 271(f) by selling, offering for sale, and/or importing into the United States, the Accused Instrumentalities. AT&T knows at least as of the date of the filing and service of the original Complaint (Dkt. 1) in this case that the accused products and/or services include hardware components and software instructions that work in concert to perform specific, intended functions. Such specific, intended functions, carried out by these hardware and software combinations, are a material part of the inventions of the '359 Patent and are not staple articles of commerce suitable for substantial non-infringing use.

196.    The acts of infringement by AT&T have caused damage to Plaintiff, and Plaintiff is entitled to recover from AT&T the damages sustained by Plaintiff as a result of AT&T's wrongful acts in an amount subject to proof at trial. The infringement of the '359 Patent by AT&T has damaged and will continue to damage Iarnach.

## JURY DEMAND

197.    Plaintiff hereby demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment in its favor and against AT&T as follows:

a)  A declaration that AT&T has infringed and is infringing one or more claims of the '242 Patent, either literally or under the doctrine of equivalents;

b)  A declaration that AT&T has infringed and is infringing one or more claims of the '359 Patent, either literally or under the doctrine of equivalents;

c)  A declaration that AT&T has infringed and is infringing one or more claims of the '378 Patent, either literally or under the doctrine of equivalents;

d)  A declaration that AT&T has infringed and is infringing one or more claims of the '013 Patent, either literally or under the doctrine of equivalents;

e)  A declaration that AT&T has infringed and is infringing one or more claims of the '892 Patent, either literally or under the doctrine of equivalents;

f)  An award of damages pursuant to 35 U.S.C. §§ 284, 285, 286, and 287 adequate to compensate Iarnach for AT&T's infringement of the Asserted Patents in an amount according to proof at trial (together with prejudgment and post-judgment interest), but

no less than a reasonable royalty, including but not limited to a post-judgment running royalty;

g)  A declaration that AT&T's infringement is willful since at least the filing of this Complaint (Dkt. 1) and enhancing damages pursuant to 35 U.S.C. § 284;

h)  An award of costs and expenses pursuant to 35 U.S.C. § 284 or as otherwise permitted by law;

i)  An award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

j)  Such other and further relief, whether legal, equitable, or otherwise, to which Plaintiff may be entitled or which this Court may order.

Dated: May 26, 2023

Respectfully submitted,

*/s/ Michael F. Heim*
Amir Alavi
Texas Bar No. 00793239
aalavi@aatriallaw.com
Demetrios Anaipakos
Texas Bar No. 00793258
danaipakos@aatriallaw.com
Michael McBride
Texas Bar No. 24065700
mmcbride@aatriallaw.com
Alavi & Anaipakos, PLLC
3417 Mercer Street, Suite C
Houston, Texas 77027
713-751-2362
713-751-2341 (fax)

Michael Heim
Texas Bar No. 09380923
mheim@hpcllp.com
Eric Enger
Texas Bar No. 24045833
eenger@hpcllp.com
R. Allan Bullwinkel
Texas Bar No. 24064327
abullwinkel@hpcllp.com
Alden Harris
Texas Bar No. 24083138
aharris@hpcllp.com
Blaine Larson
Texas Bar No. 24083360
blarson@hpcllp.com
HEIM PAYNE & CHORUSH LLP
1111 Bagby St., Suite 2100
Houston, Texas 77002
Telephone: 713-221-2000
Facsimile: 713-221-2021

Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
WARD, SMITH & HILL, PLLC
P.O. Box 1231
Longview, Texas 75606-1231
Telephone: 903-757-6400

Facsimile: 903-757-2323

**ATTORNEYS FOR PLAINTIFF**
**IARNACH TECHNOLOGIES LTD.**